AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

LODGED
CLERK, U.S. DISTRICT COURT
**6/2/2022**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ cs _____ DEPUTY

for the

Central District of California

United States of America

v.

MATTHEW JOHNSON,

    Defendant(s)

Case No.   2:22-mj-02185-DUTY

FILED
CLERK, U.S. DISTRICT COURT
**June 2, 2022**
CENTRAL DISTRICT OF CALIFORNIA
BY: ____ ch ____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 2, 2022, in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Jason Malik*
*Complainant's signature*

_____
Jason Malik, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   June 2, 2022

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Paul L. Abrams, U.S. Magistrate Judge
*Printed name and title*

AUSA: Varun Behl (x0687)

## <u>AFFIDAVIT</u>

I, Jason Malik, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Matthew JOHNSON, also known as Matthew Mitchell JOHNSON ("JOHNSON") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2.   This affidavit is also made in support of an application for a warrant to search 1420 South Figueroa St, Apartment 731, Los Angeles, California, 90015 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, and the person of JOHNSON, as described more fully in Attachment A-2, for evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 371 (Conspiracy), Section 922(a)(1)(A) (Dealing in Firearms without a License), Section 922(g) (Felon in Possession of a Firearm), and Title 26, United States Code, Section 5861 (Possession of Unregistered Firearms) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.

Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a Task Force Officer with United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), currently assigned to the Los Angeles Field Division, Group II of the Los Angeles Police Department ("LAPD"), Metropolitan Division Task Force.  I have been a peace officer for the LAPD for approximately 24 years.  My mission within this task force includes reducing gang-related and violent crime, assisting in the investigation, identification, location, and apprehension of persons that have committed crimes within the City of Los Angeles or against the United States, and utilizing proactive methods to monitor and prevent criminal activity.  I have been assigned to the Metropolitan Division / ATF Task Force for approximately six years.

5.    I received seven months of basic law enforcement training while attending the Los Angeles Police Academy.  I have also received several specialized training blocks in narcotics and firearms.  During my time as a peace officer, I have conducted hundreds of firearms and narcotic related investigations, including conducting surveillance at known narcotics, gang, and illegal firearm sales locations and observing the actions and methods utilized by offenders in the course of buying and selling contraband.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.    Between May 2, 2022, and May 19, 2022, JOHNSON sold multiple firearms and ammunition on five separate occasions to an ATF Confidential Informant (the "CI")[1] and an ATF undercover agent (the "UC").  As a convicted felon, JOHNSON is not permitted to possess any firearms.  All of the sales occurred either inside the SUBJECT PREMISES or in the parking garage of the SUBJECT PREMISES.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.    Based on my review of law enforcement reports, conversations with other law enforcement agents and officers, conversations with other witnesses, and my own knowledge of the investigation, I know the following:

**A.    On April 25, 2022, the CI Meets JOHNSON**

8.    Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from April 25, 2022:

a.    On April 25, 2022, the CI was involved in an operation to purchase firearms from a different person near 54th Street in Los Angeles, California.  The CI was wearing an audio-video recording device during the deal.  During this deal, the

---

[1]    The CI has been compensated approximately $5,600 thus far for his/her assistance in this investigation.  Over the past four years, the CI has been paid a total of $60,425 for all of the assistance he/she has provided for his/her assistance on ATF investigations.  The CI has prior felony convictions for theft with a prior and burglary.  The CI has a misdemeanor conviction for theft.  The CI has worked with ATF on several occasions over the past four years and has consistently provided credible and reliable information.

CI was introduced to JOHNSON.  The CI had not previously met JOHNSON.  JOHNSON told the CI that his name was "East."

        b.   JOHNSON showed the CI numerous photographs and videos on his cell phone of firearms and people shooting firearms.  One of the videos appeared to be of a person firing a fully automatic firearm.

        c.   JOHNSON told the CI to contact him directly to purchase any firearms.  JOHNSON and the CI exchanged phone numbers.  JOHNSON provided 424-205-7919 as his phone number to the CI.

        9.   Over the next few days, LAPD officers and I used various law enforcement databases and undercover social media accounts to identify JOHNSON.  I discovered a person with the name of Matthew JOHNSON on social media.  I then located a criminal history for Matthew JOHNSON.  The UC and I compared JOHNSON's previous booking photograph with the person captured on the CI's video recorder and believe that they are the same person.  Additionally, the moniker listed on JOHNSON's criminal history is "Baby Eastwood."

    **B.   On May 2, 2022, JOHNSON Sells the CI Three Handguns and Ammunition**

        10.  Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from May 2, 2022:

        a.   Between April 26, 2022, and May 2, 2022, the CI and JOHNSON exchanged a series of text messages.  During the

text messages, JOHNSON sent photos of firearms as well as prices.  The CI agreed to buy two AR style firearms and three handguns from JOHNSON.  The deal was set for May 2, 2022.

b.   On May 2, 2022, I outfitted the CI with a camera recording device and an electronic transmitting device.  The CI was given $7,900 dollars to purchase firearms from JOHNSON.  I searched the CI for contraband and found none.  LAPD officers and ATF special agents then set up a surveillance team near the SUBJECT PREMISES, where JOHNSON had directed the CI to go.

c.   The CI went to South Lebanon Street, the alleyway to the rear of the SUBJECT PREMISES.  Upon arriving in the area, the CI called JOHNSON and told him that he/she had arrived.

d.   At approximately 3:56 pm, JOHNSON emerged from the underground parking garage of the SUBJECT PREMISES.  JOHNSON offered that he and the CI could go to his apartment and look at the firearms.  The CI agreed.  As they walked to the SUBJECT PREMISES, JOHNSON told the CI that there was a waiting period in Las Vegas to purchase firearms, but that he was going back to Las Vegas following the deal.  JOHNSON alluded to the fact that he has a female buying the firearms for him in Las Vegas. JOHNSON told the CI that the AR style firearms were not ready to buy, but the handguns were ready to buy.  Both the CI and JOHNSON took the elevator to the 7th floor and entered into apartment 731, the SUBJECT PREMISES.

5

e.    Upon entering, the CI saw another male[2] and several firearms inside the apartment.  JOHNSON told the CI that "those are his," indicating that some of the firearms belonged to the other male.  JOHNSON then showed the CI the firearms for the deal.  The CI noticed three firearms in boxes laying on a table.  JOHNSON told the CI that he is obtaining the firearms from outside of California and bringing them to Los Angeles.  JOHNSON offered to bring anywhere from 20 to 40 firearms to do one large purchase instead of him making trips every week.  JOHNSON then showed the CI photographs of what appeared to be silencers on his phone.  The CI and JOHNSON then agreed on the prices for the firearms.  The CI gave JOHNSON gave $6,100.  JOHNSON also gave the CI a small box of ammunition.  The CI took the bag containing the firearms and returned to a predetermined staging location.

f.    At the staging location, I recovered the bag containing the following items: a Ruger, model LCP Max, .380 caliber handgun, bearing serial number 381359008; a Taurus, model GX4, 9mm handgun, bearing serial number IGA76737; a Glock, model 26Gen5, 9mm caliber, bearing serial number AFSF627; and 15 rounds of 9mm ammunition.  I again searched the CI for contraband.  There was no other contraband found on the CI.  I recovered the unused government funds from the CI.

g.    I examined the contents of the gun boxes and

---

[2] Through my review of law enforcement databases, criminal history reports, California DMV records, and the surveillance video, I was able to identify the other male as O.B.  O.B. is listed as a lessee on the SUBJECT PREMISES.

discovered two sales receipts.  One of the receipts was for a Glock that was purchased at Spartan Arms, in Las Vegas, Nevada on or about July 22, 2021, by B.C.C.  The other receipt was for the Ruger and Taurus that was purchased at Ventura Munitions on or about April 30, 2022.  The receipt did not show the purchaser's name.  I obtained an E-Trace report for all three firearms and learned that the Glock was purchased by B.C.C. on July 22, 2021, and the other two firearms were purchased by A.R.R. on April 30, 2022.  Both B.C.C. and A.R.R. are residents in Las Vegas, Nevada.  The opened gun boxes are depicted below:



**C.    On May 4, 2022, JOHNSON Sells the UC and CI Two AR Rifles and Three Handguns**

11.    Between May 3, 2022, and May 4, 2022, the CI and JOHNSON exchanged a series of text messages.  Based on my review of the text messages, JOHNSON sent photos of firearms, a video, and information about prices.  The photos depicted, what appeared to be, a Smith and Wesson, model M&P-15 rifle, a Smith

and Wesson, model SD9 handgun, two Ruger gun boxes, two Smith and Wesson gun boxes, a Glock gun box. The video sent by JOHNSON appeared to depict a Ruger rifle. In these text messages, the CI tells JOHNSON that he/she will be bringing another person with him/her to the deal, which was set for May 4, 2022.

12. Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from May 4, 2022:

a. On May 4, 2022, I outfitted the CI with a camera recording device and an electronic transmitter device. I searched the CI for contraband and found none. The UC was also equipped with a camera recording device. The UC was given $13,000 dollars to complete the deal with JOHNSON. LAPD officers and ATF special agents then set up a surveillance team near the SUBJECT PREMISES in Los Angeles, California.

b. The UC and CI departed the staging location in the UC's vehicle. The UC drove to South Lebanon Street behind the SUBJECT PREMISES. Upon arriving, the UC and CI saw JOHNSON standing near the parking garage of the SUBJECT PREMISES. JOHNSON directed the UC to park the UC's vehicle inside the parking garage of the SUBJECT PREMISES. The UC pulled into the garage area and parked. Both the UC and CI got out of the UC's vehicle and greeted JOHNSON.

c. The UC opened the trunk area of the UC's vehicle and JOHNSON placed two rifle boxes inside the UC's vehicle.

JOHNSON then got into the front passenger seat of the UC's vehicle while the UC got into the driver's seat.  The CI sat in the rear passenger seat.  Once inside the vehicle, JOHNSON told the UC and CI that the other three handguns were upstairs, and JOHNSON would go and get them.  JOHNSON left the UC's vehicle and went to the SUBJECT PREMISES's elevator bank.

d.    Approximately five minutes later, JOHNSON reemerged from the elevator bank.  The UC got out of the UC's vehicle and opened the vehicle's trunk.  JOHNSON put three more firearm boxes inside the trunk.

e.    The UC and JOHNSON got back into the UC's vehicle and began to talk about firearms.  JOHNSON showed the UC a video of a fully automatic firearm on JOHNSON's phone.  JOHNSON told the UC that was his personal firearm.  JOHNSON told the UC he had been selling guns for approximately 10 years.  The UC asked JOHNSON how much it was going to cost for the five firearms. JOHNSON said it was $13,000, but the CI had asked to drop the price to $11,000.  JOHNSON agreed to the $11,000.  The UC counted out the $11,000 and gave it to JOHNSON.  While the UC was counting money, JOHNSON told the UC that he uses "strippers" in Las Vegas to purchase the firearms for him.  The UC and the CI then left, and drove to a predetermined staging location.

f.    At the staging location, I recovered the firearms from the UC's vehicle and saw a Smith and Wesson, model M&P-15, .223/ 5.56 caliber rifle, bearing serial number TU20032, a Ruger, model AR-556, 5.56 caliber rifle, bearing serial number 1852-28163, a Glock, model 43X, 9mm caliber handgun, bearing

serial number BWUY167, a Ruger, model Security-9, 9mm caliber handgun, bearing serial number 385-71900, and a Smith and Wesson, model SD9, 9mm caliber handgun, bearing serial number FDZ0848.  The CI was searched again for contraband.  There was no other contraband found on the CI.  I collected the unused government funds from the UC.  The firearms and boxes recovered appeared to be the same ones JOHNSON had sent photos of to the CI.  The opened firearm boxes are depicted below:



   **D.    On May 10, 2022, JOHNSON Sells the UC and CI One Short
           Barrel Rifle, One Machine Gun Conversion, Three
           Handguns, One Revolver, and Ammunition**

   13.    Between May 6, 2022, and May 10, 2022, the UC and JOHNSON exchanged a series of recorded phone calls and text messages.  Based on my review of the phone calls and text messages, JOHNSON told the UC he was getting numerous firearms to sell which included a fully automatic machine gun, AR rifles,

and handguns.  JOHNSON also sent photos of firearms as well as prices.  The photos depicted what appeared to be an AR style, Short Barrel Rifle, Glock, model 43, bearing serial number AFDA303, an AR style firearm with a sling, an AR style handgun, a Taurus, model G3, bearing serial number ACK450889, and a Taurus, model 856, bearing serial number ADB931191.  JOHNSON told the UC that the AR style firearm with the sling was fully automatic.  JOHNSON told the UC that he wanted $16,400 for all six firearms.  The UC negotiated the price with JOHNSON down to $16,000.  The UC and JOHNSON agreed to do the deal on May 10, 2022.

14.  Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from May 10, 2022:

a.  On May 10, 2022, I outfitted the CI with a camera recording device and an electronic transmitter device.  I searched the CI for contraband and found none.  The UC was also equipped with a camera recording the device.  The UC was given $16,000 dollars to purchase firearms.  LAPD officers and ATF special agents then set up a surveillance team near the SUBJECT PREMISES.

b.  At approximately 1:25 pm, LAPD Officer Alejandro Higareda saw JOHNSON exit the parking garage of the SUBJECT PREMISES.  JOHNSON walked south in the alley and get into the passenger side of a 2015 dark grey Kia sedan, bearing California license plate 8DFJ934 (the "Kia").  Based on my review of DMV

records, the Kia is registered to C.C.H.  The Kia had dark
tinted windows and the driver could not be seen.  The Kia then
drove through the alley and into the parking garage of the
SUBJECT PREMISES.  LAPD Officer Jeff Punzalan saw the Kia park
in a space inside the garage.

   c. The UC received a text from JOHNSON who told the
UC that the supplier had arrived and all the firearms were
present.  Officer Punzalan saw JOHNSON exit the passenger door
of the Kia and walk to the alley.  The UC and CI departed the
staging location and traveled to South Lebanon Street, behind
the SUBJECT PREMISES.  The UC and CI saw JOHNSON in the alley.
JOHNSON directed the UC to park in the underground parking
garage of the SUBJECT PREMISES.  JOHNSON told the UC to park
next to the Kia.  JOHNSON told the UC and CI that the firearms
were in the backseat of the Kia, and that only two of the
firearms were in boxes.

   d. The UC parked next to the Kia and both the UC and
CI left the UC vehicle.  The UC and CI greeted JOHNSON.  JOHNSON
opened the back door of the Kia and the UC opened the trunk area
of the UC's vehicle.  JOHNSON moved the firearms from the Kia
and put them into the trunk area of the UC's vehicle.  JOHNSON
then began to describe the firearms to the UC.  The UC
specifically asked about the machine gun.  JOHNSON said he knew
for a fact that it was fully automatic.

   e. The UC then shut the trunk and told JOHNSON to
sit in the UC's vehicle.  The UC got into the driver's seat,
JOHNSON got into the front passenger seat, and the CI sat in the

rear seat.  The UC and JOHNSON briefly spoke about firearms while the UC counted out the agreed upon amount of $16,000.  The UC gave JOHNSON the money.  JOHNSON told the UC that he had a box of ammunition he would give the UC.  The UC agreed to take the ammunition.

f.   JOHNSON, the UC, and the CI got out of the UC's vehicle.  JOHNSON walked back to the Kia and opened the door while the UC opened the trunk area of the UC vehicle.  JOHNSON brought a box of 5.56 caliber ammunition to the UC's vehicle and placed it inside.  The three said their goodbyes and the UC and CI got back into the UC's vehicle.  The UC and CI then returned to a predetermined staging location.

g.   At the staging location, I recovered the firearms from the UC's vehicle.  The CI was searched again for contraband.  There was no other contraband found on the CI.  I examined the firearms.  I determined the firearms to be: a Glock, model 43, 9mm caliber handgun, bearing serial number AFDA303; a Taurus, model 856, .38 caliber revolver, bearing serial number ADB931191; a Taurus, model G3, 9mm caliber handgun, bearing serial number ACK450889; an ABC Rifle Company, model ABC-15, 7.62 caliber handgun, bearing serial number ABCR-10445; an AR style, privately manufactured short barrel rifle, unknown model, .223/5.56 caliber, bearing no serial number; an AR style, privately manufactured firearm, unknown model, .223/5.56 caliber handgun, bearing no serial number; a 3D printed, machine gun conversion, unknown model, bearing no serial number; and 300 rounds of DZR, 5.56 caliber ammunition.

13

The firearms appeared to be the same ones JOHNSON had sent
photos of to the UC.

        h.   I conducted a function test of the AR firearm
with the sling.  I determined that the firearm appeared to be
fully automatic.  I removed the rear takedown pin of the AR
firearm with the sling, and observed a "drop in auto sear"
inside the fire control housing of the lower receiver.  Based on
my training, knowledge, and experience, the hammer of the
firearm is cocked by the bolt carrier as it moves rearward.  The
carrier then pushes the hammer down and the sear of the drop in
auto sear grabs the hammer, thus making the weapon fully
automatic.  Additionally, I measured the length of the apparent
short barrel rifle.  The barrel measured approximately 8 inches
long.  The firearms are depicted below:



**E.   On May 18, 2022, JOHNSON Sells the UC Six Handguns
(One with an Obliterated Serial Number), One Revolver,
and Ammunition**

15.   Between May 16, 2022, and May 18, 2022, the UC and
JOHNSON exchanged a series of recorded phone calls and text
messages.  Based on my review of these calls and text messages,
JOHNSON told the UC he had several firearms for sale and sent
photos of the firearms to the UC.  The firearms in the photos
appear to be a tan colored, Canik55 handgun, a Taurus handgun, a
Sig-Sauer, model P226 handgun, a Springfield, model XD handgun,
and a Kahr handgun.  JOHNSON also said he had a Glock, 9mm
handgun for sale.  The total price for the firearms was $13,000.
The UC and JOHNSON agreed to do the deal on May 18, 2022.  On
May 17, 2022, JOHNSON and the UC spoke again.  JOHNSON told the
UC he was getting more firearms, one of which was a FN handgun
which would cost an additional $3,800.

16.   Based on my review of recorded video surveillance, my
conversations with other law enforcement agents, and my own
observations, I learned the following series of events from May
18, 2022:

a.   On May 18, 2022, the UC was outfitted with a
camera recording device and an electronic transmitter device.
The UC was given $16,800 dollars to purchase firearms from
JOHNSON.  LAPD officers and ATF special agents then set up a
surveillance team near the SUBJECT PREMISES.

b.   At approximately 3:40 pm, the UC departed the
staging location and went to South Lebanon Street, behind the
SUBJECT PREMISES.  The UC pulled into the underground parking

garage of the SUBJECT PREMISES and texted JOHNSON.  JOHNSON
responded and stated he was on his way.

      c.    At approximately 3:51 pm, LAPD Officer Ruben
Rodriguez saw JOHNSON walk up to the UC's vehicle.  JOHNSON was
carrying a bag with him.  The UC and JOHNSON then entered the
UC's vehicle.  JOHNSON removed a Ruger gun box and began to show
the UC the Ruger, model Ruger 57, along with the 5.7 caliber box
of ammunition.  JOHNSON told the UC that his friend was not able
to bring two of the firearms JOHNSON had sent the UC photos of,
but he was able to replace them with two other handguns.
JOHNSON proceeded to show the UC all the firearms.  The UC
examined each firearm.

      d.    The UC and JOHNSON continued to talk about
firearms.  During their conversation, JOHNSON told the UC he was
not allowed to have firearms as he was a convicted felon.  The
UC asked JOHNSON if he was a "trigger puller."[3]  JOHNSON
responded affirmatively and said that is why he has a nickname
of "Eastwood."  JOHNSON said this nickname was in reference to
Clint Eastwood's character in "Dirty Harry."  The UC verified
the price of the firearms for the current deal.  JOHNSON agreed
that the price was $16,800.  The UC then counted out $16,800 and
gave it to JOHNSON.  The two said their goodbyes and JOHNSON
exited the UC's vehicle.  The UC then travelled back to a
predetermined staging location.

      e.    At the staging location, I recovered the firearms

---

[3] Based on my training and experience, the term "trigger
puller" is coded language used to whether an individual shoots
people.

from the UC's vehicle.  I examined the firearms and saw: a
Ruger, model Ruger-57, 5.7 caliber handgun, bearing serial
number 643-78051, a Glock, model 19, 9mm handgun, bearing
number AAKS362, a Sig-Sauer, model P226, 9mm caliber handgun,
bearing serial number UU655828, a Taurus, model PT-145 Pro, 9mm
handgun, with an obliterated serial number, a Taurus, model G2C,
9mm handgun, bearing serial number 1C072677, a Smith and Wesson,
model Airweight, .38 caliber revolver, bearing serial number
CTW8972, and a Canik55, model TP-9SF, 9mm handgun, bearing
serial number 20AT15603.  Inside the Ruger gun box, I saw a box
of FN (FNH), 5.7 caliber ammunition.  The Canik55, Taurus, and
Sig-Sauer firearms appeared to be the same ones JOHNSON had sent
photos of to the UC, and are depicted below:



   **F.   On May 19, 2022, JOHNSON Sells the UC One Short Barrel
         Rifle, Two Machine Gun Conversions, Two Handguns, One
         Rifle, and One Shotgun**

   17.   On May 18, 2022, shortly after the controlled

purchase with JOHNSON on May 18, 2022, JOHNSON called and texted the UC.  Based on my review of these recorded calls and text messages, JOHNSON told the UC that he had acquired additional firearms: "5 big, 3 fully, and 2 regular"[4] for $20,000.  The deal was set up to occur on May 19, 2022.

18.  Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from May 19, 2022:

a.  On or about May 19, 2022, the UC was outfitted with a camera recording device and an electronic transmitter device.  The UC was given $20,000 dollars to purchase firearms from JOHNSON.  LAPD officers and ATF special agents then set up a surveillance team near the SUBJECT PREMISES.

b.  At approximately 5:15 pm, LAPD surveillance officer, Officer Ruben Rodriguez saw JOHNSON leave the parking garage of the SUBJECT PREMISES holding a black, duffel style, bag.  At approximately 5:18 pm, the UC arrived and drove into the alleyway.  The UC met JOHNSON at the mouth of the parking garage for the SUBJECT PREMISES.  The UC stopped the UC's vehicle to greet JOHNSON.  JOHNSON opened the rear passenger door of the UC vehicle and placed the duffel bag inside.  JOHNSON then got into the front passenger seat of the UC vehicle.  The UC drove the UC vehicle into the parking garage

---

[4] Based on my training and experience, and my understanding of this investigation, I understood "5 big, 3 fully, and 2 regular" to mean JOHNSON had five long guns which included three fully automatic rifles, and two semi-automatic rifles.

area and parked.

        c.    JOHNSON then retrieved one of the AR style pistols from the duffel bag and opened the lower receiver. JOHNSON showed the UC the AR15 drop in auto sear.  The UC and JOHNSON continued to briefly talk about firearms.  The UC then gave JOHNSON the agreed upon amount of $20,000.  JOHNSON then got out of the UC's vehicle.  The UC returned to a predetermined staging area.

        d.    At the staging location, I recovered the firearms from the UC's vehicle.  I examined the firearms and saw: a Huglu Cooperative, model Silver Eagle RZ17, 12-gauge shotgun, bearing serial number 39-H21PT-8570, an AR style, Privately Manufactured, unknown model, .223 caliber rifle, bearing no serial number, two AR style, Privately Manufactured, unknown models, .223 caliber pistols, bearing no serial numbers, and an AR style, Privately Manufactured, unknown model, .223 caliber Short Barrel Rifle, bearing no serial number.  I conducted a function test of all four AR style firearms.  The two AR style pistols, appeared to be fully automatic.  I pushed out the lower receiver take down pin on the AR style pistols.  Inside the two AR style pistols, I recovered two Machine Gun Conversions, model AR15 Auto Sears, bearing no serial numbers.

I also measured the apparent AR style, Short Barrel Rifle.  The
barrel measured approximately 7.5 inches.  The firearms are
depicted below:



G.   **JOHNSON's Criminal History**

19.  On or about April 28, 2022, I reviewed a Los Angeles
County Consolidated Criminal History Report System ("CCHRS")
criminal history report for JOHNSON.  Based on the CCHRS report,
I learned that JOHNSON has the following felony convictions:

a.   On or about February 26, 2013, JOHNSON was
convicted for a violation of California Health and Safety Code,
Section 11352, Sales of Cocaine Base, in the Superior Court for
the State of California, County of Los Angeles, Case Number
TA12561301.

b.   On or about February 11, 2009, JOHNSON was

convicted for a violation of California Penal Code, Section
12031(a)(1), Carrying a Loaded Firearm, in the Superior Court
for the State of California, County of Los Angeles, Case Number
SWYA07225301.

### H.   Interstate Nexus

20.   On or about June 1, 2022, ATF Interstate Nexus Expert
David Gonzalez examined a Glock, model 26Gen5, 9mm caliber
handgun, bearing serial number AFSF627.  Interstate Expert
Gonzalez confirmed that the firearm was manufactured outside of
the State of California.  Because the firearm was found in
California, I believe that the firearm traveled in and affected
interstate commerce.

### II.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

21.   From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct firearms investigations, I know the
following:

a.   Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence or
business, or in places that are readily accessible, and under
their physical control, such as on their persons, in their
vehicles, or on their digital devices.  It has been my
experience that individuals who own or sell firearms illegally
will keep the contact information of individuals who are
supplying firearms or other individuals involved in criminal
activities for future purchases or referrals.  Such information

is also kept on digital devices on their person and in backpacks
or purses in their vicinity.

    b.    Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

    c.    Those who illegally possess firearms often sell
their firearms and purchase firearms.  Correspondence between
persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these
photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

### III.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

   c. The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

  23. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

   a. Digital data are particularly vulnerable to

24

inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

24.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock

function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JOHNSON's thumbs- and/or fingers on the device(s); and (2) hold the device(s) in front of JOHNSON's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IV.  REQUEST FOR NIGHTTIME SERVICE

26. I request that the Court authorize investigators to execute the warrant at the SUBJECT PREMISES during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii). Good cause for nighttime service exists because of the heightened risk of violence from JOHNSON, described above, including that JOHNSON and O.B. have had

multiple firearms in the SUBJECT PREMISES and JOHNSON has referred to himself as the "trigger puller."  The ability to serve the requested warrants at night will provide law enforcement with a better opportunity to enter the SUBJECT PREMISES without incident to ensure the safety of law enforcement officers as well as JOHNSON and other occupants of the SUBJECT PREMISES.  Given these facts, I believe that nighttime service is warranted in this case.

### V.   CONCLUSION

27.  For all of the reasons described above, there is probable cause to believe that JOHNSON has committed a violation of 18 U.S.C. § 922(g)(1): Felon In Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the premises described in Attachment A-1, and the person described in Attachment A-2.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  2nd  day of
  June  , 2022.

_____
HONORABLE PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

27